Case number 20-1489, Oglala Sioux Tribe and Alignin for Responsible Mining Petitioner versus U.S. Nuclear Regulatory Commission and United States of America. Mr. Parsons for the petitioner, Mr. Adler for the respondent, Mr. Braxley for the intervener. Thank you. May it please the court, my name is Jeff Parsons on behalf of petitioners Oglala Sioux Tribe and Alignin for Responsible Mining. This case at base is about the significant cultural resources including burials, prayer sites and habitation sites in addition to important regional groundwater aquifers that are at risk from significant impacts as a result of the Nuclear Regulatory Commission's failure in this case to follow the procedural requirements of the National Environmental Policy Act, NEPA and the National Historic Preservation Act. With respect to the National Environmental Policy Act, the process the Nuclear Regulatory Commission used violated NEPA in at least three ways I'd like to highlight. The first is that the agency prepared and finalized their environmental impact statement in a closed adjudicatory proceeding without involving the public or other agencies as required for a lawful NEPA process. The second NEPA violation derives from revisions that the agency made attempted here particularly an analysis of the purported unavailability of cultural resources information that did not comply with the explicit requirements of the CEQ Council on Environmental Quality regulation. Mr. Parsons, you are I guess assuming that those regulations apply and and there's an argument that has been made in this case that they don't so can you speak to that? That is there has been an argument to that effect your honor and there are several cases that address that. I think that a good starting point from that for that is the Council on Environmental Quality regulation at 40 CFR 1500.3 which specifically says that these regulations are applicable to all federal agencies. There is a a narrow exception or exemption contained in 1500.3a which allows an agency to escape or sort of not comply strictly with the CEQ regulations to the extent that it's inconsistent with their statutory obligations or statutory requirements. All right but I don't think we have a concession here that they didn't comply so let's assume they did. Didn't the commission find that whether or not they apply they had done enough the board in having an evidentiary hearing in fleshing out the unavailability finding in that case? There is case law that says the hearing can sometimes suffice but those cases are extremely limited to situations where the information is already included has already been done. That was a an example in the natural resources defense council case. The court discusses that and indicates that I think in that case the court certainly expressed some cynicism some doubt that that kind of process is lawful or wise but in that case the court found that sending it back a remand in that case would have been utterly futile. All right well what would a remand do in this case? I mean I understood that the unavailability finding related primarily to alleged recalcitrance by the tribe. The information was all about or the problem allegedly was the tribe's refusal to process the methodology. So if that's the case I'm not sure what sending it back for some sort of a supplement or whatnot is going to accomplish. The hearing was held in public. All of those issues were aired and so why would we remand? Why wouldn't it be futile under these services? Thank you your honor. Obviously the tribe disputes some of those characterizations made by the agency with respect to the tribe not staying true to its commitments throughout. The tribe throughout this process has been ready willing and able to aid and participate in the survey work. But that's the fact is that there has been no survey of cultural resources at this site. No competent cultural resources survey. That was the finding the adjudicated finding of the atomic safety and licensing board in 2015 affirmed by the commission in 2016. What the agency did was come back and and propose different survey methods. The tribe participated the whole time. Repeatedly the nuclear regulatory commission staff unilaterally withdrew from those discussions and those processes because effectively the tribe was not in a position to fund the process. The record shows that the agency placed the burden of complying with the law on the tribe. The tribe was not willing or able to fund the entire survey effort. As far as what could be accomplished on remand is exactly that the survey ought to be accomplished. No I'm talking about for the violation that relates to the CEQ alleged CEQ regulations violation. Right so that regulation at the time it's gone through some changes but the same language appears was 40 CFR 1502 22. And that requires the agency in an environmental impact statement to do four things. Have a statement of the unavailability. A statement of the relevance of the incomplete information. A summary of existing credible evidence. So that never occurred. There was never a summary of what exists out there. The tribe brought forth affidavits and other examples of existing available information that the nuclear regulatory commission staff never investigated, never asked, never looked into. Fourth and importantly is that the 1502 22 requires that the agency eval in that same process of the 1502 22 exemption or unavailability finding that it evaluate the impacts based on theoretical approaches or research methods accepted in the scientific community. So even where there is an unavailability finding it still requires the agency to conduct an analysis based on the information it has, theoretical approaches and research methods accepted in the scientific community. Mr. Parsons if we assume for a moment that we agreed with the NRC that the CEQ regulations are not binding on the nuclear regulatory commission. In that instance what would be your argument under NEPA or the NRC regulations themselves? I mean does your claim wholly depend on the CEQ regulations binding the NRC? No. So if you start with the statute the National Environmental Policy Act as interpreted by this court in public employees for environmental responsibility versus hopper that's 827 f third 1077 at 1081 to 1082 it talks about the the statute requiring in the language of the court the principal way the government informs the public of this decision making is by publishing environmental impact statements 42 USC 43322 C. Agencies must prepare and make publicly available these statements. Now that's reflected in the commission's own regulations at 10 CFR 51.73 and 10 CFR 51.74. Your claims are not that there wasn't an environmental impact statement it's more about how they should have been amended and updated and further specified. I mean are those requirements from the statute or the NRC regs is there support for that? Because NEPA is pretty I mean NEPA doesn't provide very much guidance at all about what how precisely its mandates are to be implemented. That's true what it does require is is robust public involvement and what you have in this case is instead of a publication of an environmental impact statement including this unavailability determination or any analysis of cultural resources you have essentially briefing to an administrative adjudicatory body in a closed process the public was not allowed to participate in this process. In order to have been involved parties would have had to petition as the tribe did to intervene over 10 years ago and meet what Commissioner Barron in his dissent on the commission ruling indicates or describes as a strict and and fairly restrictive process for for getting involved. And so that the there was never an environmental impact statement that included this information it was only in the briefing of the agency sent to that administrative body. So there was no opportunity for the public to to supply comments no opportunity for the other agencies state or federal to review and and deal with that as required again by the NRC's own regulations at 10 CFR 51.73 and 51.74 requires that other federal agencies other state agencies Indian tribes the public have opportunity to provide those comments and that's essentially the the purpose of NEPA is this cross-pollination this idea that you put this information out to the public so that the agency can be well informed and perform what's the hallmark of NEPA which is that hard look analysis which I guess Mr. Parsons I'm what what I'm trying to assess is the extent to which the tribes alleged recalcitrance to participate in the process that they insisted happen over a period of years why doesn't that provide important context for us in evaluating whether or not the agency has satisfied its NEPA obligations. So you know I understand that ordinarily we would be in a world in which the agency has the obligation to determine cultural resources it has to go out on its own and look for the information and if it can't find it then perhaps per these the the regulations that you point to the CEQ regulations or other regulations they might have to make certain statements but that's in the sort of ideal world where we haven't had prolonged engagement with a tribe that says the way in which you do this is you have to have an interview with the elders you have to you know engage us in a certain way etc and then changed its mind about it and made it difficult to follow that process why can't and why shouldn't the court take into account what actually happened here when deciding whether the where all of the unavailability was fleshed out and deciding whether or not that was sufficient to satisfy any duty regarding cultural resources in this case. Yeah thank you your honor I think the record reflects that that the tribe was engaged in in cooperative and it was the nuclear regulatory commission staff in fact that repeatedly pulled the plug so to speak for instance if you look at the if you look at the sort of the last interaction between the parties in February March of 2019 what you end up with is a example where the tribe brought together all of its leaders including leaders of other tribes and had a regulatory commission staff and its consultant and everyone agreed at that meeting that things would go forward and this was going to be a productive relationship and we would put together this methodology that NRC staff never actually put together. Literally a week later on March 1st 2019 NRC staff sends a letter saying we're done with this we're not going to go forward with those processes this is at those letters you can find it joint appendix 1888 is the NRC's sorry go ahead and give us the sites 1888 and then the tribe's letter is at JA 1857 and do you dispute that prior to that the NRC staff had provided a proposal for methodology and the tribe at one point had agreed to it? The tribe had agreed to a process there was never a methodology put forward on the table that's the problem is that the the NRC said that here's here's the process we're going to follow that and as a component of that the tribe and the NRC staff and its consultants will develop a methodology for the site survey and the problem came when the Nuclear Regulatory Commission staff failed to provide any methodology for the tribe to review or assess what it did was relied on the tribe both to provide the methodology as well as methodology as you're using it in this sure I'm talking about the actual process by which the people would walk the site and figure out what kinds of cultural resources are on there what kind of transects you'd use how far apart people would be how many days you would go what kind of area you would review once you acquire that information what would be the process by which the tribe and interested parties and the commission staff and its consultants would review and analyze that I thought the methodology was supposed to be generated by the contractor in consultation with the tribes I thought that was one of the five prongs of the original March proposal that the tribe agreed to this is a very fact-specific case so I may have gotten it wrong but I thought there was a proposal that had five steps to it or pieces to it including the hiring of a contractor and that the contractor was supposed to propose the methodology and the tribe agreed and there was per diem or whatnot for a certain number of tribe people to be involved and it was all basically put together and then the tribe pulled out am I wrong about that I think you are wrong about that okay the the NRC staff consultant never put together that methodology in fact the the methodology that they had suggested uh in 2018 was what would be called an open site approach which was not a methodology it was a sort of you you all go out there and see what you can find and then let us know and the tribe had informed NRC from the very beginning that was unacceptable and that's what led to the original adjudication finding that there was a violation of both NHPA and the National Environmental Policy Act so the tribe was prepared and working with the with the consultant the NRC staff consultant to prepare that methodology to work on that and that's when the Nuclear Regulatory Commission staff on March 1st 2019 withdrew unilaterally withdrew entirely from the process and decided it would rather litigate instead of instead of do the the work on the ground and unfortunately that what you mentioned is the per diem and the and the and the cost that was associated with what the record reflects as an honorarium a ten thousand dollar honorarium to the tribe and that was supposed to in in the agency's view compensate for all the effort the tribe was supposed to put forward but what came came out eventually or ultimately was that the NRC staff was relying on the tribe and its personnel to actually conduct the site-specific pedestrian walking survey of the site and the in the in the Atomic Safety Licensing Board hearing the the math was was done during the hearing and even the most basic survey of a site like that would require minimum $30,000. If I go back and I read the board's decision coming out of the hearing am I going to see a different story about who's responsible for unavailability and if so doesn't the board's version get some deference from the court as long as there's substantial evidence in the record to support what the board concluded the facts are about how this thing transpired don't we have to give that deference? Well I think what you'll find in the record is the board was was equivocal on and did not want to assign blame and in fact said it's not sure it's not clear who did who did what or who is to blame for this the fact is the survey never got done and now the Nuclear Regulatory Commission staff wants to come in and try to assert unavailability of information using relying on the CEQ regulation at 40 CFR 15022. So that was the the basis of the ultimate the last hearing in the case and as we argue doing that process is not an environmental impact statement it's a closed adjudicatory hearing where the public was excluded entirely. If you look at the summary disposition ruling that the National Historic Preservation Act issues the board found that the NRC staff had complied at a bare minimum with the National Historic Preservation Act consultation requirements and that was based literally on one introductory face-to-face meeting and two exchanges of letters none of which were substantive and if you look at the requirements of the National Historic Preservation Act they're very clear that the meaningful and good faith consultation must be for identification evaluation and mitigation of impacts for cultural resources. Mr. Parsons you're over your time. Thank you. So if you want to take a minute to you can just rest on the briefs of the rest of the year. I think the papers are pretty well. I will just note that what you find in this case repeatedly is instead of conducting the required analysis under the National Environmental Policy Act or the National Historic Preservation Act what the the board the Atomic Safety Licensing Board affirmed by the commission did was essentially add conditions to the license. Whenever there was a problem they couldn't resolve or an issue that wasn't analyzed what they would do is add a condition to the to the license. They did that with respect to cultural resources saying we'll place a monitor for construction. No input from the tribe, no consultation on that mitigation requirement. With respect to the boreholes the thousands of abandoned unidentified boreholes at the site they did the same thing. Here's a license condition saying the company should make its efforts to find those boreholes. No analysis of that or how they're going to do that or what the impacts might be. With respect to the transportation and disposal of radioactive waste that was not analyzed in any depth in any NEPA document. It actually was in the EIS Mr. Parsons. I mean I found places where they talk about waste disposal so it seems odd that you would argue that it wasn't what what they did is relied on the generic environmental impact statement which talked about a generic route through the southern half of the United States. What you have in this case is a specific proposal to dispose of the radioactive waste in White Mesa Utah which would require a much different transportation route across high Rocky Mountain passes that was not addressed and nor was the disposal or the issues that White Mesa discussed in any way shape or form in the EIS. It was entirely on the generic. Do you have any actual record evidence that links the substantive changes in the license to the procedural deficiencies that you say occur here? I understand your argument which is every time we see a license provision being added we think that's because they didn't do enough in the EIS but is there something that expressly makes that connection in the record? Well the those conditions were added in the board rulings in the commission rulings where they identify yes this is a gap and so we're going to add these add these conditions as a result of those. I mean they don't say here we're we know that NEPA requires us to say or evaluate a certain condition or a certain impact and instead of doing that we are going to add a condition. I didn't see that anywhere in the record. So that that's how the borehole condition arose. That's effectively how the tribe cultural resource monitoring condition arose. If you look at the the last ruling of the atomic safety licensing board they find that the programmatic agreement doesn't provide effective mitigation and thus they will add that condition. And unfortunately at the end of the process adding conditions that attempt to resolve those gaps doesn't provide the National Environmental Policy Act process does not provide the tribe with the required National Historic Preservation Act consultation. The NHPA specifically requires meaningful and good faith consultation on things like mitigation of impacts and by adding a condition at the last minute with with no opportunity for comment or review by the tribe. Of course I'm really really worried about the implications of your argument in this regard because it seems that you would be disincentivizing agencies from actually making licensing provisions that would be beneficial to the environment or to your clients or to whatever. I don't it's an odd argument to suggest that because in the license they've decided to have a monitor for example to mitigate against any future impacts in an environmental setting that just because they've done that it somehow means that they didn't do sufficient work up front pre-license per NHPA. I don't think that's what we're arguing. Of course any license condition that would be beneficial to the tribe's interests or protection of the environment I think would be welcome. The problem is the NHPA process is such that these draft environmental in comments on the draft environmental impact statement. There's nothing new that arose and so all these issues were in front of the agency. So they went through the draft environmental impact process decided not to include any of that decided to finalize that impact statement and then go to litigation in front of the board on what they thought the staff was a legally compliant environmental impact statement. The board found that it was not legally compliant and instead of sending it back for the public review process that NEPA requires they simply tack on these conditions and so it's not that the conditions shouldn't be considered it's that the National Environmental Policy Act and the National Historic Preservation Act provide these processes that are necessary to comply with the law. They're right out of the statute in NEPA 42 USC 43322C it says the EIS issues must be prepared before taking any federal agency action. That means before the license is issued these things have to be addressed. Similarly in National Historic Preservation Act at 54 USC 306108 it talks about prior to the issuance of any license the agency must take into account the effect of on cultural resources of any undertaking. So the statute congress mandates that the agency do these processes in a certain way that and your and your argument is that they're adding the licensing provisions which by the way indicates that they were cognizant of these issues because they added a license provision so but you're suggesting that that is is not compliant with NEPA even though that you said they had the information before them in the draft process which I think is the purpose of NEPA right to make sure that they're considering things so they had it they may not have put it into the final EIS but they made it into a licensing provision and you say there's a NEPA violation as a result? Yes by adding those conditions without any public review without allowing any other agencies or the tribe to comment or or give input it violates both the National Historic Preservation Act with respect to the cultural resources as well as the National Environmental Policy Act. All right any further questions Judge Rao, Judge Jackson? All right thank you we'll give you a couple minutes on rebuttal Mr. Parsons. Thank you. We'll hear from Mr. Adler. Thank you your honors may it please the court my name is James Adler represent the Nuclear Regulatory Commission in the United States. The Iguala Sioux tribe and other interveners in this case filed numerous adjudicatory contentions through the NRC's adjudicatory hearing process which produced a number of board and commission decisions as some of your honors questions have recognized. All of the issues petitioners raised in their briefs were dispositioned through these hearing decisions but petitioners briefs and really again the petitioners here at argument largely ignore what the board and commission actually said in these decisions and petitioners also largely have ignored the underlying record documents that the board and the commission relied on in making these decisions. Petitioners instead proceed essentially as if the NRC through this extensive decade-long hearing process never spoke to any of these issues. NRC's hearing decisions as our brief discusses reasonably disposition these various contentions that are the subject of this court does petitioners fail to grapple with the NRC's reasoning and the underlying record support for it in any meaningful way this court should deny the petition for review. Can you just address for me if we were to find that 40 CFR 1502 21 the CEQ regulation is applicable here do you agree that with the petitioner's contention that it was not that that regulation was not complied with in this instance? No your honor the finding in the hearing process was that whether or not it it applies I think the NRC's position is it's not legally binding but even if it were the NRC complied with it through the adjudicatory record developed in the hearing process consistent with court decisions and I think the the licensing board met through the very went through the various criteria of that CEQ regulation found that that they'd been complied with and didn't see a need to require an essentially a redundant EIS supplement to say here's what the hearing process already said and all these publicly available hearing decisions. Further there's no but but I guess I guess that begs the question of so so you're you're saying that that you understand it's not literal compliance but but the non-compliance wasn't prejudicial error seems to be what your position is. Your honor I think there are two things the first is the the judicial acceptance thus far of the NRC's approach of using this public hearing process you know in appropriate situations to supplement EIS and here there was no additional cultural resource information to report in a supplement to the already completed EIS so this would have been a supplement explaining why there's no environmental impact information which isn't something that trips the the judicial standard for requiring a supplement under NEPA which is new and significant environmental impact information that paints a seriously different picture of the environmental landscape here it's the same picture there's just some additional hearing decisions that are already publicly available that provide more information on why no additional environmental impact information. The regulation has more specifics to it than that right it's not just I I understand if the regulation and that Judge Wilkins was asking about was just the part about explain why this information is not available but it seems to me that 40 CFR 1502.22 v 1 um has some pretty detailed requirements for what the agency is supposed to say so is it your position that the record of the hearing evaluated the impacts of based on theoretical approaches or research methods generally accepted in the scientific community that's one of the the prongs here. Your honor I think the I mean the the licensing board's 2019 decision went through these issues in the most detail um I think this has to be understood in the context of the information the NRC was trying to gather which was information that really only the Iguala Sioux tribe can provide which is the Iguala Sioux tribes views on whether there are any features at the site or any properties at the site that are of cultural importance to the Iguala Sioux tribe and the Iguala Sioux tribe's position aggressively throughout the the proceeding was that only the Iguala Sioux tribe can provide this information the board discusses this several times in its decisions and so I mean the fact that the NRC tried several times to get this information from the Iguala Sioux tribe to arrange surveys so that the Iguala Sioux tribe would have I mean this is the this is the context in which we're operating here I don't think there's you know scientific methodologies and things like that to investigate here. Yes to that point um after you know the survey didn't take place why did the commission not conduct oral interviews with the tribe about the cultural resources I mean isn't that a step that the commission could have taken even without the surveys or should have arguably taken? Your honor and the the commission discussed this in its 20-9 decision a bit um the interviews I think were seemed like the petitioners are arguing that the NRC should have just gone out and conducted these oral interviews but that that would go outside of usual government-to-government consultation approach used in in this culture resource context um and the tribe had been pushing all along for the NRC to ensure that consultations were on a government-to-government basis so the idea that the NRC would just go out and directly anything that had been contemplated in the proceeding to that point and I think the the methods excuse me sorry go ahead more about that in terms of the government so you think the individual oral interviews would be inconsistent with the government-to-government approach what about the NRC's obligation to you know to satisfy NEPA and the NH the NHPA? Right um well the oral interviews I think were considered as part of the overall approach that would involve a survey and oral interviews to provide additional information on properties identified through the survey I don't think they were contemplated by the NRC at any point as just a standalone activity that wouldn't be related to the survey so this would have been very you know significant change in addition to you know seemingly being outside of the government-to-government process because um this was not something that the Iguala Sioux tribe had arranged this was something the Iguala Sioux tribe said hey you didn't do this you could have done this but it was always contemplated as part of the you know some agreed upon survey approach and as a component to inform the results of that survey. Mr. Parson I mean excuse me Mr. Adler can you speak to Mr. Parson's characterization of why the negotiations broke down he suggested that it was really the staff that gave up on the process? Your honor in the the staff's determination and when it it decided to to cease negotiations um it was based on the the clear wide and even expanding gulf between the parties and the fact that now you know many years into this process of um consulting with with tribes and then the additional years of focused consultation with the Iguala Sioux tribe things didn't seem to be getting towards any sort of actual survey being conducted. In 2018 the Iguala Sioux tribe had had the the licensing board and the staff convinced that the Iguala Sioux tribe was fine with the so-called March 2018 approach that the NRC staff working with a contractor had had developed this is uh at JA 1840 um in the joint the spring and and uh the the winter and spring in 2018. Then in June um the tribe called a halt to the survey as it was as it was uh getting in motion said we want to hold a meeting instead and the NRC staff complied put off starting the survey went to the meeting um and at that meeting the tribe presented this quality services contractor proposal that the tribe had obtained that would have involved many more people much more time to survey the site um a much larger geographical area to survey would have cost the neighborhood of two million dollars and then said all right now NRC staff your job is to take this new proposal we've just given you at the 11th hour right before our survey and figure out a way to fit this into whatever you think is a reasonable budget um which and the NRC staff I think very reasonably did not know what to do with that um and then this a similar cycle not quite the same but repeated in 2019 um when the NRC staff's contractor developed a a methodology referred to as the the February 19th or 2019 methodology this is a joint appendix 1864 to 1887 um which the the petitioners say was not a methodology but it was it was a a draft methodology with uh with room for the tribe to provide input to the extent that it wanted to as for as well as for other Sioux tribes that were participating at the tribe's request in this process to provide input um and at a meeting to discuss this as the 2019 LBP 19-10 decision um that the response to this methodology was essentially you need to redraft this whole thing and here are things we want in it which sounded very much like the two million dollar quality services proposal that we do have that LBP 1910 and I tried to ask Mr. Parsons whether or not the story that he was telling about who was responsible for the unavailability was something that he was gleaning from the various records or what whether the board sort of set it up that way I hear you suggesting and I see for example on JA 897 that there is a unavailability am I misreading this or was there was there uh a commission finding a board finding um that the the tribe really was why we don't have this information um I think it's two things there is the uh the finding you're discussing in that section b um the Oglala Sioux tribe non-cooperation being a reason for the information being unavailable the other component was the board um with the commission later affirming uh finding that the NRC staff had proposed reasonable methods for obtaining this information through a survey and the Oglala Sioux tribe had had rejected those so I think you know absent if the NRC staff had proposed nothing or its proposals had not been found reasonable then then we might be in a different place but the board and the is that the petitioner say is the NRC's responsibility to try to obtain this information but those proposals were were rejected your honors I see my time is up if there are any specific issues you'd like me to address I'm I'm happy to uh Judge Rao, Judge Jackson yeah all right thank you council here from council for intervener good morning your honors may it please the court my name is Christopher Pugsley I'm here on behalf of the intervener in this case and the current NRC licensee Powertech USA Inc. um while there have been a few other contentions raised on appeal by petitioners other than cultural resources um I think this court would benefit from a quick overview of how NRC conducts its licensing and regulation regulatory oversight uh over ISR projects in recovery first the atomic energy act and the commission's implementing regulations dictate that a multi-tiered approach must apply to ISR not can but must so first you have to obtain a license all that requires is an application that shows sufficient information to assess the award in the surrounding license site area to make sure that NRC's statutory mandate is satisfied which is that the measures taken are adequately protective of public health and safety and the environment from potentially significant adverse impacts as we discuss on page 10 of our brief once the license is issued before the licensee can even start doing site-specific construction they must demonstrate to NRC that they have obtained all other relevant permits Powertech is currently in possession of a underground injection control permit and an aquifer exemption under a statute the petitioners don't even bring into question which is a safe drinking water act and currently for the state of South Dakota the U.S. Environmental Protection Agency retains jurisdiction to issue that and that was issued and it is now on appeal but most importantly with respect to groundwater the aquifer exemption clear-cut objective definition in the statute is the water in the ore zone cannot now nor ever in the future serve as a source of public drinking water Powertech is also required to get two permits from the state of South Dakota which we have not yet obtained so truth be told we can't do anything at the site right now anyway after the all the permits are obtained the licensee is allowed to construct the site but that's not the end of the regulatory oversight from NRC NRC is responsible for these projects for conducting what is known as a pre-operational inspection and this goes directly to the by-product material issue petitioners raise the groundwater issue that they raise and the mitigation measures issue they raise because if the standard operating procedures prescribed by NRC for mitigation are not in place to NRC's standards or if a by-product material contract is not in place or if Powertech hasn't adequately defined what petitioners seem to think is termed baseline groundwater data but it's not the actual groundwater data has to establish what is known under 10 CFR Part 40 Appendix A criterion 5b5 of what's known as commission approved background so because you cannot actually get commission approved background without installing a complete well field with a monitor well ring because the monitor wells are designed to detect what are called excursions and those are early warning systems that mobile constituents have released to the monitor well and then at that point you have to cease operations and bring back those constituents to NRC's satisfaction. So Mr. Pugsley you seem to to be talking about whether and to what extent any harms are actually going to occur no construction is yet started and here are all the other regulations that would control it. Do you have a view about whether or not the commission has violated the procedural regulations concerning the preparation of the environmental impact statement? Do you have any view on that part of this case? Yes your honor I do. I believe that the NRC staff through the concurrence of the licensing board and the commission did satisfy both statutes most importantly with respect to National Historic Preservation Act. The statute basically says you are required to consult but you cannot force a tribe to come out to the site. That's not a prerequisite to approval of a license issuance. With respect to the rest of the SEIS these matters like groundwater byproduct material waste management as you put earlier they were delay of the land the standard format delay of the land is set up in what section three of the supplemental EIS and the impact analysis is in section is in chapter four. So that is pretty much it and what I would like to say about ISR projects is they are handled regulated and developed pretty much with limited exceptions the same way and that's the reason why the NRC staff was able to develop a generic or programmatic environmental impact statement which they used to tear the supplemental EIS off of and tearing NRC staff said when they developed it is an accepted CEQ approach to dealing with a programmatic environmental impact statement. And so you don't see anything deficient about the primary generic one or the supplements in this case given your experience and you say this happens all the time. No ma'am I see no defects and you have to also take that there are two aspects to a license approval. One is the supplemental EIS and then there is also an accompanying safety evaluation report that addresses the technical matters that then there is the totality of the administrative record which is known as the record of decision and by commit by case law by commission case law licensing boards can amend a license or an EIS by affirmative judicial decision and the reason I'm saying this is it happened the same way in the NRDC versus NRC case involving Strata Energy. The board instituted a brand new license condition which frankly if you ask me I think was a bit unprecedented but they said you have to plug all the abandoned boreholes before you proceed. Now the way ISR works your honor is they do what are called pump tests when a well field is fully installed. The pump tests are designed to detect whether there's communication between abandoned boreholes and the ore zone water and every site that has ever been licensed in this country has multiple abandoned boreholes because you got to find the ore block and delineate it. So I would say your honor the short answer to your question is the record of decision is complete. I'd just like to offer one thought on the cultural resources. Very little has been mentioned about the programmatic agreement and as Mr. Parsons said the programmatic agreement was added as a condition. They added condition to it which is fine. We don't have power tech has no argument with that but the point is the programmatic agreement under 36 CFR part 800 is by far the most stringent approach to site development monitoring of cultural resources. The advisory council on historic preservation and this is at JA898 signed a letter and this was almost unprecedented. I'm not familiar with any other time they've ever done this but they signed a letter to NRC that said you have satisfied the reasonable and good faith standard under the NHPA. So and that is very very important and then there is yet one more additional safeguard that Mr. Parsons has failed to allude to on cultural resources which is there is a standard clause of condition. I'm sorry your honor a condition put in every single ISR license called an unanticipated discovery clause which is if you are say hypothetically excavating some material to lay a foundation for a processing plant or you're drilling a well and you find something at nine ten feet down the rule is you have to immediately stop what you're doing and get qualified experts out there to evaluate it to find out whether there is mitigation available such as fencing it off which they do did at the church rock site in New Mexico for that case was evaluated by the 10th circuit and then you know then you if you but it doesn't preclude you from destroying a cultural resource if it's not significant. So and I'm not saying that's something we want to do because we really don't but I would say that that is an additional safeguard put in and on cultural resources now most importantly on the programmatic agreement we can forget about all the provisions associated with it for the time being but it is the tribe did not sign it and typically in the case of programmatic agreements or memoranda of agreements under 36 CFR part 800 tribes don't sign them so which is fine but Mr. Parson's client is allowed once we start to develop the site that the lawless sue can just come out and say look we want to be part of the process and they're free to do so and I mean it goes to show you that NRC along with EPA in the state of South Dakota this is a three-way regulation of a property that is by far the most environmentally benign form of mining in this country so your honors I apologize I've significantly gone over my time if I may sum up or answer any other questions you have Judge Rao, Judge Jackson all right thank you counsel thank you all right counsel for petitioner you were out of time but we'll give you two minutes for rebuttal thank you your honor I appreciate that I just want to address a couple things with respect to Mr. Adler's argument on behalf of the the agency there was no bar to proceeding with conducting oral interviews the tribe encouraged that and in fact 1502 22 or 21 there's some confusion just because the regs have been changed since it was 22 when all relevant matters in this case occurred so that's what we've been referring to it's 21 now does require additional information to be all existing information to be accounted for and and as was laid out in in the record there are multiple declarations from Lakota people who indicate that they have information about the site and would have been willing to provide that it's not that the Oglala Sioux tribe government is the keeper of all cultural resources information of the Lakota people it's that the statute the National Historic Preservation Act requires consultation with the tribe so there's certainly information additional information out there that NRC could have and should have I think the NRC's position was not that there might not be such information but that seeking such information in individual interviews would upset the government to government relationship or consultation I don't think there's any basis for that anywhere in the record the the government to government are the consultation issues derived from the National Historic Preservation Act what we're talking about is the National Environmental Policy Act is the 1502 22 requirements and as you see in joint appendix 1709 and forward there are multitudes of of people with relevant information who are ready willing and able to discuss with the agency I just want to address the Mr. Pugsley's reference to the Advisory Council on Historic Preservation letter and the programmatic agreement both of those documents were finalized in 2014 prior to the Atomic Safety Licensing Board finding that neither NHPA nor the National Rehabilitate the the statutory violations at this point those were well on the record prior and in fact if you look at the programmatic agreement it is predicated one of the predicates prerequisites for that document is that it's a finding that there have been adequate cultural resource analysis or surveys conducted and that was found to be not true adjudicated found to be not true by the board as a form as affirmed Mr. Parsons can you point us can you point us in the record to the place in which the tribe encouraged direct interviews without a site survey so the we did that in our in our briefing also if you I think one of the best places to look are the letters that were exchanged between NRC and and the tribe the tribe's letter again JA 1857 I think is a a good example of the tribe explaining how it's been consistent throughout and how it's been trying to require the agencies to come through and participate with the tribe in developing the methodology and yet it appears Mr. Parsons my last question is yet it appears that the board in its very lengthy recitation of what happened according to it and I'm talking about the final decision after the hearing at gosh I don't even know where I am JA 8 in the 800s in 900s talks about the facts in a way that seems inconsistent with the inferences that you would have us draw from things like the letters and I'm wondering what we as the appellate body what we can do in terms of looking at the facts aren't we to some extent to give deference to what the board found were the facts about who cooperated who didn't cooperate whether it was to interview witnesses or the like whether there was a valid methodology proposed by the staff I mean it seems like all of that is covered in this lengthy determination of the board that involves a lot of facts and ordinarily we give deference to an agency in its determinations of fact particularly after a lengthy evidentiary hearing right thank you your honor I would say that the the facts or the any findings with respect to who who was at fault for pulling back on the cultural resources surveys is is largely irrelevant on the law the law applies it's rather it's the nuclear regulatory commission's obligation to comply with the national environmental policy act if the if the commission felt like the tribe was not going to participate then it had other avenues to pursue and was legally obligated to do so it's the it's the agency's responsibility to meaningfully consult with the tribe in good faith under the national historic preservation act and it's the agency's responsibility to comply with its environmental review responsibilities for cultural resources and and as we quoted in our briefs a couple times the agency cannot push those obligations off onto third parties and that's basically what's occurring in this case is that the nrc is saying well if the tribe isn't playing the way we'd like them to play then we don't have to comply with our statutory responsibilities and that's just not what the law says again we dispute that that the tribe was was somehow recalcitrant i think those in particular those interactions in february and march of 2019 that i alluded to in the record at 1888 j a 1888 and 1857 do shed considerable light on that issue so i would encourage a review of those interactions all right thank you we have your argument we'll take the case under advisement
judges: Wilkins, Rao, Jackson